Аmerican Broadcasting Companies, Inc., Appellant, v Warner Wolf et al., Respondents.

First Department, July 10, 1980

## APPEARANCES OF COUNSEL

*Philip R. Forlenza* of counsel (*Laura V. Jones* and *Philip R. Hoffman* with him on the brief; *Hawkins, Delafield & Wood*, attorneys), for appellant.

*Ivan Shefferman* for Warner Wolf, respondent.

*Robert M. Callagy* of counsel (*Satterlee & Stephens*, attorneys), for CBS Inc., respondent.

## OPINION OF THE COURT

SULLIVAN, J.

At issue is whether, at the instigation of CBS, Warner Wolf, a sportscaster, breached the good faith negotiation and first refusal provisions of his contract with ABC and, if so, whether ABC is entitled to equitable relief. Contrary to Trial Term's finding, we hold that Wolf did indeed breach his contract, although we also conclude that the grant of equitable relief is not warranted.

Wolf had been employed by ABC since 1976 as a sportscaster, and for the past three years he had been the regular

sportscaster on WABC-TV, its New York affiliate. In February, 1978, he and ABC negotiated an employment agreement which, by virtue of ABC's subsequent exercise of a renewal option, had a termination date of March 5, 1980. The agreement contained what is commonly referred to in the broadcasting industry as a "first negotiation/first refusal" clause. It provided: "You agree, if we so elect, during the last ninety (90) days prior to the expiration of the extended term of this agreement, to enter into good faith negotiations with us for the extension of this agreement on mutually agreeable terms. You further agree that for the first forty-five (45) days of this negotiation period, you will not negotiate for your services with any other person or company other than WABC-TV or ABC. In the event we are unable to reach an agreement for an extension by the expiration of the extended term hereof, you agree that you will not accept, in any market for a period of three (3) months following expiration of the extended terms of this agreement, any offer of employment as a sportscaster, sports news reporter, commentator, program host, or analyst in broadcasting (including television, cable television, pay television and radio) without first giving us, in writing, an opportunity to employ you on substantially similar terms and you agree to enter into an agreement with us on such terms. We shall have five (5) business days following receipt in which to accept such offer as it is made or make changes that are not, in the aggregate, material; and we shall be required to match the character of employment only in substance and not in every particular. Any such written notice from you to us of an offer received shall specify compensation; term of employment, options to terminate, character of employment, and other principal terms and conditions."

Thus, under this clause Wolf agreed to negotiate in good faith with ABC during the 90 days preceding the March 5, 1980 expiration date for an extension of the contract on mutually agreeable terms. Wolf agreed to negotiate exclusively with ABC during the first half of the 90-day period, and, if he and ABC could not reach an agreement for an extension of the contract, not to accept, for a period of three months after the expiration of the contract, an offer of employment as a sportscaster without first giving ABC, in writing, an opportunity to employ him on substantially similar terms. If ABC failed to offer him a similar contract within five business days after receipt of such written offer, Wolf was free to accept the other offer at any time.

At his request Wolf met with WABC executives in September of 1979 (almost two months before they were required to do so under the contract) to discuss a renewal contract. At that meeting Wolf, who was receiving an annual compensation of $150,000 in the last year of the 1978 agreement, requested a two-year contract at an annual compensation of $400,000 for the first year and $450,000 for the second year. He also wanted the opportunity to do 16 half-hour football specials. ABC countered with a three-year offer at an annual graduated salary of $325,000, $367,500 and $400,000. ABC would not agree to Wolf's request to do football specials, however, and asked for additional time until October 15. Wolf, who was anxious to have the matter resolved, agreed.

Unknown to ABC, Wolf met with representatives of CBS on October 4, 1979, and expressed interest in joining CBS, requesting a two-year contract on the same terms he had requested of ABC. At that meeting Wolf discussed the good faith negotiation and first refusal provisions of his ABC contract and, in fact, gave a copy of the first page of his ABC contract containing those provisions to CBS' representatives. On that copy, received in evidence at trial, the following was underscored: "you agree that you will not accept, in any market for a period of three (3) months following expiration * * * any offer of employment as a sportscaster".

Wolf and ABC's representatives met again on October 12, with Wolf expressing willingness to reduce his salary demands if ABC would commit itself to the 16 football specials. ABC increased its salary offer, but still refused to agree to the other terms and promised "to get back" to Wolf in 10 days. Four days later, on October 16, unknown to ABC, Wolf again met with CBS' representatives. Wolf's contractual demands were again discussed, as were the terms of the good faith negotiation and first refusal provisions.

Despite the promise ABC did not contact Wolf again until January 2, 1980. At this time Wolf refused to "budge" from his original salary demand of $400,000/$450,000. A subsequent meeting took place on January 17, and the next day Wolf was given a written proposal which provided for a three-year contract at an annual compensation of $400,000/450,000/500,000, with a commitment for the 16 half-hour football specials subject, however, to approval by ABC's board of directors. Wolf advised that he would not accept the offer because of ABC's delay in getting back to him and the immi-

nent expiration of the 45-day exclusive negotiation period. He also told ABC that his lawyer had advised him to "see what the other options are." Wolf agreed to get back to ABC within a week.

On February 1, Wolf again met with CBS' representatives and advised them that he wanted to work at CBS at the earliest possible date. By the close of their meeting CBS and Wolf had agreed on the terms of Wolf's employment as the WCBS sportscaster, and the parties shook hands on the deal. No discussion took place about any producer's contract, or of splitting Wolf's employment into two separate contracts, or of Wolf's freedom to accept an off-air position prior to June 4, the termination date of ABC's right of first refusal. Wolf acknowledges that at the February 1 meeting "the oral understanding was $400,000 for my sportscasting services."

That weekend (February 2-3), a CBS executive called Wolf and advised him that CBS had prepared two different contracts, one a producer's agreement for immediate execution, and the other the sportscaster's agreement. According to Wolf, CBS' executive told him "We're going to divide up the money, one in an on-the-air sportscaster's contract, another on off-the-air sports producer's contract. We'll divide the $400,000 in equal parts of 200, 200. Second year 225, 225", to which Wolf replied "Fine, it makes no difference to me."

On Monday, February 4, Wolf was presented with two contracts, one an 18-page sportscaster's agreement signed by CBS, annexed to which was a one-page letter, also signed by CBS, providing that in return for $100 paid by Wolf "WCBS-TV agrees to hold open its offer of employment, under the terms and conditions set forth in the attached draft agreement, until June 4, 1980, and WCBS-TV shall not withdraw such offer prior to that date."

The second contract, the producer's agreement, related to Wolf's services as an off-air producer of sports specials, primarily the 16 half-hour football specials, and was to take effect March 6, 1980, for an initial pay period of 13 weeks followed by a two-year term. This agreement contained the following "exclusivity" clause: "Artist's services shall be completely exclusive to CBS during the term of this Agreement, and during such term Artist will not perform services of any nature for, or permit the use of Artist's name, likeness, voice or endorsement by, *any person, firm or corporation, or on*

Artist's own account, without Station's prior approval, which approval shall not be unreasonably withheld."

That same day, February 4, after discussing the exclusivity provision, Wolf signed the producer's agreement, and gave CBS a $100 check for the irrevocable option on the sportscaster's agreement. A salary of $400,000 for the first year, $450,000 for the second year, was divided equally between the two agreements.

The next day, February 5, Wolf submitted to ABC a letter of resignation, which concluded: "Since the expiration date does occur in mid week, I would be more than happy to complete the week & work Thursday & Friday, March 6 and 7—providing of course, it is clearly understood, for all concerned, *all legal obligations of the binding contract terminate upon conclusion of the late night news, March 5, 1980."* (Emphasis added.) At this juncture Wolf had not told ABC about his written contractual arrangements with CBS.[1]

On February 6, Wolf met again with ABC's representatives and expressed his grievances against WABC and ABC sports. These included ABC's delay in negotiating with him and downgrading of his worth. In his words, he felt he had no future with ABC network sports. ABC responded with various offers and promises, including network exposure. Wolf answered that it was too late; he had made a "gentlemen's agreement", a "moral commitment", and would leave ABC on March 5, "unless they wanted me to finish the week." In neither this discussion nor a similar one the next day did Wolf mention his February 4 contractual arrangement with CBS, nor did he inform ABC that he was contractually barred by reason of the exclusivity provision in the producer's agreement with CBS from offering his sportscaster's services in any possible renewal of his employment contract with ABC. On February 6 and 7, 30 days remained under the 90-day good faith negotiation period of Wolf's contract with ABC.

On February 11, Wolf called Richard O'Leary, an ABC executive, and asked if ABC would compromise on its three-month first refusal right, and allow him to work a portion of that period. On February 19, after contacting ABC's legal department, O'Leary advised Wolf that ABC wanted him to

---

1. In fact these arrangements were not disclosed until Wolf's deposition on May 20, 1980, after this action had been commenced.

work during this 90-day period but that it "was unwilling to waive any of its contractual rights."

On February 19, Wolf, at his attorney's suggestion, sent ABC a handwritten letter "embodying the terms of the contract I [want]" for the 90-day first refusal period, stating: "Number two, it is also clear, that *effective March 6, 1980,* or thereafter, I am free to *accept* an offer to work elsewhere, upon the expiration of the 90 day period, which is June 4, 1980". (Emphasis added.)

Thereafter, after consultation with Wolf's attorney, a letter agreement covering Wolf's employment for the 90-day first refusal period was drafted by an ABC lawyer. It provided in pertinent part: "The term shall be for the period from March 6, 1980 through May 28, 1980 at 12:00 midnight. It is understood and agreed that *on or after June 4, 1980,* you may *accept* an offer of employment with anyone of your choosing and immediately begin performing on-air services. It is further understood and agreed that this agreement shall in no way affect our mutual rights and obligations pursuant to the agreement between us dated February 1, 1978." (Emphasis added.)

Wolf signed the letter agreement on February 22 on the advice of his attorney. The second sentence of the agreement was a concession to Wolf's attorney, who wanted it understood that Wolf was free to go elsewhere, with no strings attached, at the end of the 90-day period. In his pretrial deposition, used at trial, Wolf testified that before signing the letter agreement he asked what was meant by the sentence "[i]t is further understood and agreed that this agreement shall in no way affect our mutual rights and obligations pursuant to the agreement between us dated February 1, 1978", and that he was told "all it means is that you cannot sign an agreement, on the air agreement, during these ninety days." Wolf replied "Fine that's no problem. Let's sign it."

Both parties thereafter performed their respective obligations under the February 22 letter-agreement. Although suspicious that Wolf might have made a deal in violation of its right of first refusal, ABC did not commence this action until May 6, by which time Wolf's anticipated switch to CBS was a matter of public knowledge.

In its complaint ABC sought injunctive relief only, seeking to bar Wolf from working at WCBS-TV and specific performance of its 1978 contract by a direction that Wolf submit

CBS's offer of employment to ABC to be matched. In fact, at trial, both in its opening statement and to a lesser extent in its summation, ABC abjured any claim for damages. The essence of ABC's complaint is that Wolf and CBS negotiated a contract for Wolf's services as a sportscaster on WCBS-TV, the principal competitor of WABC-TV, in violation of ABC's contract with Wolf, and that CBS, with actual knowledge of the ABC contract and its terms, induced Wolf to make the deal and breach the good faith negotiation and first refusal clauses of that contract.

A preliminary injunction was issued enjoining CBS from employing Wolf as a sportscaster on WCBS-TV and preliminarily enjoining Wolf from so entering CBS' employ, with a direction for an immediate trial which was concluded on June 3 after this court refused to intervene. In a decision filed June 9, 1980, Trial Term dismissed the complaint but continued the preliminary injunction for 48 hours. A Justice of this court refused to continue the preliminary injunction pending appeal but granted ABC's application for an expedited appeal, with the merits of which we are now confronted.

■ We take judicial notice that after the close of this record and expiration of the preliminary injunction Wolf commenced performing sportscaster's services for WCBS, and continues to do so, while WABC carries on with a replacement for Wolf,[2] whose services, we are told, are unique.

■ In our opinion, the evidence adduced at trial amply supports the conclusion that, at CBS's instigation, Wolf breached the first refusal provision of the ABC contract. Pursuant to that provision, Wolf could not, prior to June 4, 1980, accept any offer of employment as a sportscaster "without first giving [ABC] in writing, an opportunity to employ [him] on substantially similar terms and [Wolf] agree[d] to enter into an agreement with [ABC] on such terms."

In varying forms, the right of first refusal is used throughout the radio and television industry as a device in aid of the broadcaster-employer's retention of the services of major talent in whom the broadcaster has made a significant investment. The contractual right of first refusal, also known as a "right to match", is a valuable right which has enjoyed the protection of the courts. (E.g., *Allen v Biltmore Tissue Corp.,* 2

2. ■ Courts may take judicial notice of facts which are part of the general knowledge of the public. *(Hunter v New York, Ontario & Western R. R. Co.,* 116 NY 615.)

NY2d 534; *New Atlantic Garden v Atlantic Garden Realty Corp.,* 201 App Div 404, affd 237 NY 540; *Sargent v Halsey,* 42 AD2d 375; *Costello v Hoffman,* 30 AD2d 530; *Cowles v Cowles Realty Co.,* 201 App Div 460.) Even though a grantee's right of first refusal may never ripen into a right absolute, the grantor of such right owes the grantee "the obligation of dealing in good faith." *(Quigley v Capolongo,* 53 AD2d 714, 715, affd 43 NY2d 748.)

Analysis of the evidence discloses that on February 1, 1980 Wolf and CBS had orally agreed that CBS would engage Wolf as a sportscaster for two years, at an annual compensation of $400,000 for the first year of the contract and $450,000 for the second year. The subject of a separate producer's role or producer's contract or splitting the $400,000/450,000 compensation between two separate roles, sportscaster and producer, was never discussed. The agreement provided that Wolf would be paid for his sportscasting services. It was not until later, sometime over the February 2-3 weekend, that CBS, whose executives had obtained a copy of ABC's first refusal provision from Wolf in October, 1979, advised Wolf that the agreement would be covered by two contracts.

On February 4, 1980, when Wolf signed the producer's agreement, he did so with full knowledge of its exclusivity provision which precluded him from rendering services of any nature for anyone or appearing on television in any capacity for the two-year term of his contract, which was to become effective on March 6, 1980, the first day of the three-month first refusal period of his contract with ABC. That same day Wolf, apparently fully satisfied with all of the terms and conditions in the 18-page sportscaster's agreement, obtained a signed letter from CBS giving him an irrevocable option until June 4 to sign that agreement, thus securing the sportscaster's position at CBS immediately upon the expiration of ABC's right of first refusal.

This record makes apparent that the producer's agreement was, in fact, one half of a contrived bifurcation of the sportscaster's agreement, already orally reached on February 1, and that its all-inclusive exclusivity provision was the mechanism utilized by CBS to obtain, prior to the expiration of ABC's right of first refusal and in avoidance of it, Wolf's commitment to become the CBS sportscaster on June 4, 1980. Thus, CBS accomplished its goal of securing Wolf's sportscasting services on February 4 without the necessity of having Wolf actually

sign a sportscaster's agreement until ABC's right of first refusal had expired. By so arranging the February 4, 1980 agreements, with knowledge of ABC's right of first refusal, CBS induced Wolf's breach of his 1978 contract with ABC. (See *Israel v Wood Dolson Co.,* 1 NY2d 116; *Campbell v Gates,* 236 NY 457; *Lamb v Cheney & Son,* 227 NY 418; *Posner Co. v Jackson,* 223 NY 325.)

■ ■ In concluding that the execution of the producer's agreement and the simultaneous grant of an irrevocable option to Wolf to enter into a sportscaster's contract on June 4, 1980 did not violate ABC's right under the first refusal clause because Wolf had not, on February 4, formally accepted CBS' offer of employment as a sportscaster, Trial Term lauded form over substance and ignored compelling evidence that Wolf and CBS had structured the February 4 agreements so as to circumvent ABC's right of first refusal. Wolf's own testimony made clear that he never considered the possibility of working for CBS only as a producer, and not as an on-air sportscaster. "A court of equity looks to the merits and does not exalt form above substance." *(Washer v Seager,* 272 App Div 297, 306, affd 297 NY 918.) Equity should "never suffer the mere appearance and external form to cancel the true purposes, objects and consequences of a transaction." *(Sargent v Halsey,* 75 Misc 2d 624, 627, affd 42 AD2d 375, *supra.)*

■ Moreover, at the time the February 4 agreements were executed, 30 days remained in the 90-day good faith negotiation period provided in the 1978 ABC contract. By virtue of the all-inclusive exclusivity provision contained in the CBS producer's contract, Wolf was contractually precluded from accepting any ABC offer, no matter how attractive. Thus, by entering into the producer's contract, Wolf had deprived ABC of its right under the 1978 contract to his good faith negotiations for the extension of that contract.

■ The Court of Appeals has stated: "[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of that contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. [Citations omitted.]" *(Kirke La Shelle Co. v Armstrong Co.,* 263 NY 79, 87.)

■ Contrary to defendants' contentions, we do not find that the February 22 letter agreement between Wolf and ABC

covering the extended 90-day work period extinguished ABC's right of first refusal. Although this agreement was concededly beneficial to both parties—ABC had the use of Wolf's services during the "May sweeps", an important rating period in the television industry, and Wolf, on the other hand, would not be forced to remain "on the beach" for three months—it was Wolf, not ABC, who initiated the proposal that he work beyond the March 5 expiration of his contract.

Wolf conceded that when ABC's O'Leary accepted his offer to work for the additional 90 days he told Wolf that ABC was unwilling to waive any of its contractual rights. Wolf further admitted that he understood this to mean he could not accept a sportscaster's offer before June 4. The documentary evidence is consistent with this position. In his handwritten letter of February 19 to CBS, Wolf wanted it made clear that "effective March 6, 1980, or thereafter, I am free to accept an offer to work elsewhere, upon the expiration of the 90 day period." His letter concluded with the provision "If this summarizes your understanding of our 90 day agreement, please show your acceptance by signing below." Needless to say, Wolf never obtained ABC's consent to this proposed agreement. Instead, he signed the February 22 letter agreement which explicitly provided that "this agreement shall in no way affect our mutual rights and obligations pursuant to the agreement between us dated February 1, 1978." Thus, in language which is unmistakably clear and not in conflict with the preceding sentence that "on or after June 4, 1980, you may accept an offer of employment with anyone of your choosing and immediately begin on-air services"—a right which Wolf had under the 1978 contract—the parties were merely maintaining the *status quo.* The sentence allowing Wolf to accept an offer after June 4 was, no doubt, felt by Wolf to be essential to preclude the claim that the three-month period of first refusal would run anew by virtue of his agreement to work until June 4.

Having established that Wolf breached the good faith negotiation/first refusal provisions of the ABC contract by accepting the February 4, 1980 CBS offer, the issue remaining is whether ABC is entitled to equitable relief. Stressing equity's traditional role in fashioning a remedy appropriate to the case before it (see *Baldwin-Bellmore Fed. Sav. & Loan Assn. v Stellato,* 55 Misc 2d 1043), ABC asks this court to exercise its ingenuity to find the resolution which is most just (see *Livingston v Bauchhens,* 254 App Div 692; *Weisinger v Berfond,* 21

Misc 2d 788), even though no precedent on the precise question is ascertainable (see *Duncan v Laury,* 249 App Div 314, 317; also, *McHugh v Paley,* 63 Misc 2d 1092).

Among the equitable remedies which ABC suggests is specific performance, that is, affording ABC the right to match the CBS offer. Precedent exists. It has been held that once a grantor is willing to accept a particular offer, he must afford his grantee the opportunity to accept the terms of the offer before contracting with anyone else, and if the grantor violates this obligation, the grantee will be awarded specific performance if it matches the third party's offer. *(Cortese v Connors,* 1 NY2d 265; *Colonie Motors v Heritage Corp. of N. Y.,* 61 AD2d 1105; *Demetres v Schulman,* 3 AD2d 673.)

In the alternative ABC asks for injunctive relief. It seeks to restrain Wolf, for no longer than the two-year term of his February 4, 1980 agreement with CBS, from working for CBS as a sportscaster unless and until he gives ABC a written opportunity to employ him on substantially similar terms as those provided in the February 4, 1980 CBS agreement. ABC's acceptance of such offer within five days thereafter and Wolf's execution of an agreement with ABC on those terms would terminate the injunction. Conversely, Wolf's failure either to make the offer or enter into the agreement would continue the injunction restraining him from working for CBS for up to two years.

Against CBS, assertedly its principal rival, ABC seeks an injunction, *inter alia,* restraining it from employing Wolf as a sportscaster until he complies with the terms of the injunction issued against him and from enforcing any rights under the February 4, 1980 agreement and its progeny. The rationale underlying such relief, if granted, may be simply stated: "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong" *(Riggs v Palmer,* 115 NY 506, 511).

Of course, insofar as these remedies are applied in the factual setting presented, no distinction exists between an injunction and order of specific performance. An order to perform is no more than an injunction in mandatory form directed to the person of the defendant. But, irrespective of whatever remedies are available, this is not, in our view, a case where equitable relief is either warranted or appropriate.

■ ■ It has long been a principle of equity that the performance of contracts for personal services depends upon

the skill, volition and fidelity of the person who has engaged to perform such services and that it is impracticable, if not impossible, for a court to supervise or secure the proper and faithful performance of such contracts. *(De Rivafinoli v Corsetti,* 4 Paige Ch 264.) Thus, as a general rule equity will not enforce specific performance of contracts for personal services. (See, e.g., *Bethlehem Eng. Export Co. v Christie,* 105 F2d 933; *Nassau Sports v Peters,* 352 F Supp 870; see, also, Restatement, Contracts 2d, § 381, subd [1] [Tent Draft No 14].) Subdivision (1) of section 381 of the Restatement states: "A promise to render personal service exclusively for one employer will not be specifically enforced."

■ While equity has fashioned injunctive relief in other right of first refusal cases (see *New Atlantic Garden v Atlantic Garden Realty Corp.,* 201 App Div 404, affd 237 NY 540, *supra; C & B Wholesale Stationery v De Bella Dresses,* 43 AD2d 579), we are unable to find any instance where personal services were involved. Aside from equity's disdain for the specific enforcement of contracts for personal services, specific enforcement of ABC's right to match CBS' offer under the first refusal clause and ultimate award of the contract to ABC is all the more impractical as a remedy here in light of Wolf's stated reluctance to continue working for ABC. As Trial Term noted, this lawsuit has only exacerbated an already strained relationship, and Wolf is now apparently adamant. No cogent reason is shown to break with precedent and to order an unwilling party to perform services of a personal nature, especially since we remain unconvinced that ABC does not have an adequate remedy at law for any damages suffered as a result of Wolf's breach.

■ In arguing inadequacy of the remedy at law, ABC stresses that Wolf's services are unique,[3] that it introduced him to the New York market, and that it expended considerable sums in advertising him to the public, secure in the knowledge that the right to match provision of its agreement with Wolf would afford it a fair opportunity to retain his services under a new contract. Of course, if the services to be rendered are of an unusual or unique nature, then the situation is more clearly one in which an adequate remedy at law does not exist. In such cases a rule, generally traced to the English case of *Lumley v Wagner* (1 DeG M & G 604, 42 Eng

3. We note that a party's characterization that a certain service is unique is not binding on the court.

Rep 687), decided in 1852, has developed. Where a contract for such unique services contains a negative covenant by the one who is to render the services that he will not render like services for anyone else during the contract term, equity will enjoin the breach of this negative covenant, if no adequate remedy at law is available and the contract is fair and reasonable. (See, e.g., *Frederick Bros. Artists Corp. v Yates,* 271 App Div 69, affd 296 NY 820; *Clark Paper & Mfg. Co. v Stenacher,* 236 NY 312, 320; *Kaumagraph Co. v Stampagraph Co.,* 235 NY 1, 9.) Injunctive relief is especially appropriate where the breach of the negative covenant entails a damage by itself apart from the breach of the affirmative covenant. (See Pound, Progress of the Law—Equity, 33 Harv L Rev 420, 440.) Thus, in recognition of the harm that a unique performer can cause an employer by working for a rival in breach of his contract, our courts have restrained newspaper columnists, athletes, actors, singers and other performers from working for the new employer for periods ranging from one to three years or seasons. (See, e.g., *King Records v Brown,* 21 AD2d 593; *Rogers Theat. Enterprises v Comstock,* 225 App Div 34; *Shubert Theat. Co. v Gallagher,* 206 App Div 514; *Long Is. Amer. Assn. Football Club v Manrodt,* 23 NYS2d 858; *Hastings Attractions v Howard,* 119 Misc 326; *Associated Newspapers v Phillips,* 294 F 845.)

Other jurisdictions have enforced restrictive covenants involving broadcasting personalities. (See *Skyland Broadcasting Corp. v Hamby,* 2 Ohio Opns 2d 426, a radio disc jockey; *Clooney v WCPO Tel. Div. of Scripps-Howard Broadcasting Co.,* 35 Ohio App 2d 124, a television personality; *Cullman Broadcasting Co. v Bosley,* 373 So2d 830 [Ala], a radio announcer; *Evening News Assn. v Peterson,* 477 F Supp 77, a television anchorman; cf. *Orion Broadcasting v Forsythe,* 477 F Supp 198, 201, an anchorwoman.)

But even where an employer seeks to enjoin the performance of a unique service by an ex-employee for a competitor, an injunction will be granted only where the covenant sought to be enforced is reasonable. *(Post v Merrill Lynch, Pierce, Fenner & Smith,* 48 NY2d 84; *Purchasing Assoc. v Weitz,* 13 NY2d 267.) This principle is firmly grounded in a public policy favoring competition and the personal freedom to pursue the career of one's choice. The Court of Appeals has stated: "Undoubtedly judicial disfavor of these covenants is provoked by 'powerful considerations of public policy which militate

against sanctioning the loss of a man's livelihood' [citation omitted]''. *(Reed, Roberts Assoc. v Strauman,* 40 NY2d 303, 307.)

With this principle as a guide we conclude that the imposition of any restraint on Wolf performing sportscasting services for CBS would be inappropriate. The restrictive covenant in the 1978 contract is an integral part of the first refusal provision and is limited to a term of three months following expiration of the contract, during which period ABC had the right to match any other offer received by Wolf and to employ him on terms substantially similar to those offered by a third party. Thus, even were restraint appropriate, three months, and not the term of the CBS contract, would be the measure of the length of any restrictions against Wolf working for a competitor.

Moreover, the first refusal clause was not a restrictive covenant in the true sense. Rather, it was a three-month moratorium on Wolf's employment as a sportscaster *"in any market"* (emphasis added), and, coupled with ABC's right to match during the same period, was obviously intended as the bargaining tool by which to force Wolf into extending his contract with ABC. If Wolf did not renew he would have to remain "on the beach" for the three months following the expiration of his contract, an absence which, given the ever changing tastes of the viewing public, might prove fatal to the career of a less imposing media personality. Arguably, of course, Wolf's absence would serve another purpose. His successor at ABC would have three months, free of the competition of Wolf at CBS, in which to cultivate the viewing public's taste. In any event, with formal notice that Wolf would not renew, ABC opted to utilize his talents during the May ratings sweeps, and waived its right to place him in television limbo for the same period of time.

In such circumstances, the grant of equitable relief, the effect of which is to force Wolf to continue a strained relationship with ABC, would be highly inappropriate. Although, in light of our holding, we need not reach the issue of whether ABC comes to us with unclean hands and laches, we note that we do not find factual support in the record for Trial Term's finding that ABC was barred from equitable relief on these grounds.

ABC has also argued that if we cannot grant some form of appropriate equitable relief, we should remit this matter to

Trial Term for a hearing on damages. As already noted, ABC failed to submit any proof on this issue. While a court of equity may award money damages, even though none were sought, when it is unable to grant the specific relief demanded *(Doyle v Allstate Ins. Co.,* 1 NY2d 439, 443; *Kaminsky v Kahn,* 23 AD2d 231), a remand to take proof on damages is not warranted. This action was commenced before Wolf had ever performed a single sportscast for CBS, and even before the expiration of the three-month first refusal period, during which ABC would have been without his services had he elected to remain "on the beach." It was the function of this lawsuit to secure the continued services of a valued performer, and it seems fairly obvious that no thought was given to damages, if indeed any have been or will ever be sustained as a result of Wolf's departure. ABC may, of course, if it be so advised, commence a new action at law. We note, in passing, that the acts of which ABC complains are of recent occurrence, so that the Statute of Limitations is not a consideration.

Accordingly, the judgment, Supreme Court, New York County (SHERMAN, J.), entered June 9, 1980, dismissing the complaint, should be affirmed, without costs or disbursements.

The appeal taken by the above-named defendants from the order of said court (GAMMERMAN, J.), entered on May 27, 1980 which granted plaintiff's motion for a preliminary injunction and denied defendants' cross motion to dismiss the complaint should be dismissed as abandoned without costs and without disbursements.

KUPFERMAN, J. (concurring in the result). The majority opinion fairly sets forth the facts. However, as to the law, I can agree only with the conclusion. An injunction and adherence to the terms of the employment agreement would be warranted were it not for the letter agreement of February 22, 1980 drafted by the plaintiff, which I am satisfied released the defendant Wolf (and therefore the defendant CBS) "on and after June 4th, 1980".

MURPHY, P. J. (dissenting). I agree with the majority's finding that defendant Wolf breached the 1978 contract with ABC. However, I disagree with its conclusion that ABC is without remedy even though Wolf is in breach of that 1978 contract. This court should exercise its equitable powers to grant ABC injunctive relief.

In the exercise of discretion, which is exercised with caution and reluctance, a court of equity will, in a proper case, enforce a negative covenant against the performance of services elsewhere, if the services of a defendant under a contract are so peculiar, special, unique, extraordinary and irreplaceable that a breach of the contract will result in irreparable injury to the plaintiff, and there is no adequate remedy at law. It should be stressed that a negative covenant need not be expressly set forth in a contract; it may be implicitly found in a contract (28 NY Jur, Injunctions, § 86, at pp 413-414).

In view of the substantial salary that CBS has agreed to pay defendant Wolf under the producer's and sportscaster's agreements, CBS cannot seriously contest the fact that Wolf's services are unique. Moreover, paragarah 6 (a) of the producer's agreement confirms the unique character of Wolf's services in the following language: "6. (a) Artist acknowledges that his services and the rights and privileges granted to CBS hereunder are unique; and CBS shall be entitled to injunctive and other equitable relief to prevent any breach of this Agreement by Artist."

In determining whether injunctive relief is appropriate, the next question presented is whether ABC has an adequate remedy at law. As the majority observes, ABC did not prove monetary damages at trial. This failure on ABC's part is not an indication that it has not been damaged; rather it is a sign that ABC's damages are very difficult to prove.

At this early juncture, ABC can only speculate as to how its ratings might be adversely affected by the loss of Wolf's services. Even at a much later date, ABC will have a formidible task in establishing that its ratings suffered as a direct result of Wolf's defection. Television ratings are influenced and ultimately set by countless variables. The loss of Wolf's services is but one variable that is not easily measured.

The 1978 contract between Wolf and ABC does not contain a negative covenant prohibiting him from working for other television stations if he does not honor the "matching" provision in that contract. Nonetheless, a negative covenant must be read into that contract if ABC's rights thereunder are to be effectively protected (*Rogers Theat. Enterprises v Comstock*, 225 App Div 34, 36). Under the terms of that 1978 contract, ABC has a right to match, in substance, any offer made to Wolf in the three-month period after its expiration. As the majority found, Wolf not only received an offer, he accepted

an offer prior to the expiration of the 1978 contract. This court, in the exercise of its equitable powers, should give ABC the benefit of the contract and permit it to match, in substance, the terms of Wolf's agreements with CBS. For purposes of the "matching" provision, ABC must be required to make an offer that is substantially similar to the combined terms of the sportscaster's and producer's agreements.

Therefore, ABC should be given five business days to match the combined offer made by CBS to Wolf. If ABC makes an appropriate offer within that five-day period, Wolf has the choice of either accepting or rejecting it. If he chooses to reject the offer, he should be enjoined from competing against ABC in the New York City area for the two-year period of that contractual offer.

The record indicates that Wolf has had his differences with certain executives at ABC. Wolf believed that those executives did not appreciate his services and that they did not offer him a new contract reflecting the value of his talents. Nonetheless, Wolf was not justified in breaching the 1978 contract because of his deteriorating relationship with those executives. Wolf breached the 1978 contract; he must now bear the consequences, unpleasant and distasteful as they might be.

Finally, there is no merit to the contention that ABC waived its rights under the 1978 contract by signing the letter agreement of February 22, 1980. First, in that letter agreement, ABC specifically reserved its rights under the 1978 contract. Second, at the time the letter agreement was executed, Wolf never informed ABC that he had entered into the written and oral agreements of February 4, 1980. Wolf's silence and deception at that time should not inure to his benefit. Third, ABC was otherwise unaware of the existence of the February 4, 1980 agreements. Consequently, ABC could not have acquiesced in or approved the February 4, 1980 agreements by signing the letter agreement.

Accordingly, the judgment of the Supreme Court, New York County (SHERMAN, J.), entered June 9, 1980, which dismissed the complaint, should be reversed, on the law, and the complaint should be granted to the extent of permitting ABC, within five business days, to match the terms of CBS' combined offer to Wolf. If ABC makes an appropriate offer, Wolf may promptly accept or reject it. If he rejects it, he shall be enjoined from competing with ABC in the New York City area for the two-year period of that contractual offer.

FEIN and CARRO, JJ., concur with SULLIVAN, J.; KUPFERMAN, J., concurs in the result in an opinion; MURPHY, P. J., dissents in an opinion.

Judgment, Supreme Court, New York County, entered on June 9, 1980, affirmed, without costs and without disbursements.

Appeal from the order of said court, entered on May 27, 1980, unanimously dismissed, as abandoned, without costs and without disbursements.