[798 NYS2d 416]

JEREMY'S ALE HOUSE ALSO, INC., et al., Appellants, v THE JOSE-LYN LUCHNICK IRREVOCABLE TRUST et al., Respondents.

First Department, July 7, 2005

### APPEARANCES OF COUNSEL

*Herrick, Feinstein LLP,* New York City (*Mara B. Levin* and *Jonathan Kline* of counsel), for appellants.

*Wilson, Elser, Moskowitz, Edelman & Dicker LLP*, White Plains (*Charles M. Feuer* and *Kathleen A. Daly* of counsel), for respondents.

### OPINION OF THE COURT

SULLIVAN, J.P.

The facts are fairly and accurately set forth in the dissent. To recapitulate: under a "last right of refusal" afforded plaintiff tenant, Jeremy's Ale House Also, Inc., pursuant to a modification of a commercial lease, the landlord, the Joselyn Luchnick Irrevocable Trust, beginning approximately three months before the lease's expiration, communicated a series of offers. According to the complaint, Jeremy's accepted two direct offers, the first for $1 million or the appraised value, whichever was higher, and the second for $1.2 million. Later, the Trust advised Jeremy's that it had received a $2.5 million offer from a third party and that Jeremy's could, under its right of refusal, purchase the property for $2.7 million. Jeremy's again accepted the offer. All of the offers were oral, as were Jeremy's acceptances. Sometime later, the Trust advised Jeremy's that it had received two other offers, one for $3.2 million and, finally, one for $3 million, as to which, under the right of refusal, the Trust offered Jeremy's the opportunity to purchase for $3.09 million.

The right of refusal at issue provides:

> "Starting January 1, 2000 the rent will be raised five hundred dollars a month. Effective May 1, 2000 the rent will be raised an additional five hundred dollars. *In consideration of these increases in the event of a sale to a third party (not an asset transfer in the family) you will have last right of refusal to beat the terms and price by 3% of any bona fide offer*" (emphasis added).

Jeremy's brings this action, seeking, inter alia, to compel specific performance of the Trust's offer to sell the premises to it for $2.7 million and damages for breach of the implied covenant of good faith and fair dealing.

We all agree that under the right of refusal Jeremy's is not entitled to specific performance of the September 2003 offer to purchase the subject property for $2.7 million, an offer, which, according to Jeremy's, it accepted. Unlike the dissent, however, we do not reach the statute of frauds issue. As the complaint alleges, this was only one of several offers submitted to Jeremy's under its right of refusal, including at least one subsequent offer, submitted on or about December 15, 2003, to sell the property for $3.09 million.

The right of refusal at issue, as it plainly states, is a "last right of refusal to beat the terms and price by 3% of any bona fide offer." Thus, Jeremy's is not entitled to specific performance of the $2.7 million offer because it was not the last offer. Contrary to its arguments, Jeremy's was not entitled to select the offer it considered the most advantageous. Its right was limited to the last offer. That being the case, the Trust could, without breaching its implied covenant of good faith and fair dealing with respect to Jeremy's right of refusal, by communicating a series of escalating bona fide third-party offers, use Jeremy's as a stalking horse to prompt it "to beat the terms and price" of those offers so as to induce a higher third-party offer.

In that regard, it must be noted that the implied covenant of good faith and fair dealing arises out of the agreement affording Jeremy's the last right of refusal and not the separate agreement to sell. Contrary to the view implicit in the dissent's reasoning, a breach of that covenant stands separate and apart from the enforceability of any agreement to sell to the holder of the right. As the Court noted in *Quigley v Capolongo* (53 AD2d 714, 715 [1976], *affd* 43 NY2d 748 [1977]), "While plaintiffs' right to purchase the property might never have ripened into an absolute one, defendant-owners owed them the obligation of dealing in good faith."

The complaint alleges that by letter dated November 18, 2003 delivered to Jeremy's by registered mail on December 15, 2003, the Trust, through its attorney, advised Jeremy's of the $3 million offer and that, in accordance with the last right of refusal, Jeremy's could purchase the premises for $3.09 million if it were willing and able to close on or about January 31, 2004 without a financing contingency. As the record shows, despite its assertion of the acceptance of the prior offer from the Trust to sell the premises to it for $2.7 million, Jeremy's advised the Trust's attorney on December 16, 2003 that it would respond to

the $3.09 million offer within 30 days from the receipt of that offer on December 15, 2003.* In that letter, Jeremy's asked for "proof that your clients received the offer set forth in the letter." From all that appears, the Trust never responded to that request, without which Jeremy's could not determine if the third party was required to close on January 31, 2004 and without a provision for a financing contingency. The answer to that inquiry would determine whether the offers were identical and whether the Trust was dealing with it in good faith, as was required (*see Wieder v Skala*, 80 NY2d 628, 637 [1992]).

Thus, while dismissal is required, given the state of the record, we would grant Jeremy's leave to amend the complaint to plead, if it be so advised, a cause of action for breach of the implied covenant of good faith and fair dealing with respect to the $3.09 million offer and for specific performance with respect to that offer. In that regard, it should be noted, the statute of frauds requirement is satisfied by the existence of a written third-party contract signed by the Trust and, assuming the attorney's authority, may be satisfied by the November 18, 2003 letter to Jeremy's advising of the $3.09 million offer (*see Scheck v Francis*, 33 AD2d 91, 94 [1969], *affd* 26 NY2d 466 [1970]).

The dissent, having rejected Jeremy's action for specific performance of the $2.7 million offer on a defense, i.e., the statute of frauds, that, given the Trust's tender of a subsequent $3.09 million offer, is only of secondary legal significance, argues that the "last right of refusal" is the same, legally, as a right of first refusal and, accordingly, should be treated no differently. This argument misses the mark.

The right of first refusal, a well-accepted term (*see e.g. LIN Broadcasting Corp. v Metromedia, Inc.*, 74 NY2d 54 [1989]; *see also Morrison v Piper*, 77 NY2d 165 [1990]; 3 Warren's Weed, New York Real Property § 32.145 [5th ed]; 22 NY Jur 2d, Contracts § 38), is a preemptive right (*Metropolitan Transp. Auth. v Bruken Realty Corp.*, 67 NY2d 156, 163 [1986]; *LIN Broadcasting Corp., supra* at 60) that "requires the owner, when

---

* While it is true that Jeremy's, on December 16, 2003, had commenced this action for specific performance of the earlier $2.7 million offer and purported acceptance, which Jeremy's acknowledged in its December 16, 2003 letter, it should be noted that on December 3, 2003, before Jeremy's receipt of the $3.09 million offer, the Trust had advised it that its rent was increased from $7,500 to $13,000 for the months of December 2003 and January 2004, and demanded that Jeremy's vacate the premises by January 31, 2004, consent to a judgment of possession and the issuance of a warrant of eviction, and execute a waiver of the right of first refusal.

and if he decides to sell, to offer the property first to the [holder] so that he may meet a third-party offer or buy the property at some other price set by a previously stipulated method" (*Metropolitan Transp. Auth. v Bruken Realty Corp.* at 163 [citations omitted]).

Here, in its December 7, 1999 letter to Jeremy's, the Trust described the right of refusal it was offering, not as a right of first refusal, with its well-known and recognized meaning as a preemptive right, but as a last right of refusal, thus according the right a different meaning. The difference is more than academic, as the dissent seems to suggest. The complaint alleges that after the initial two direct offers to sell, the Trust advised Jeremy's that it intended to advertise the premises to obtain the highest price that the market would allow. Thus, the last right of refusal provided Jeremy's with an opportunity it would otherwise not have and that no other bidder enjoyed. It could beat any offer by 3% and the transaction could not close without affording Jeremy's that opportunity. If nothing else, the last right of refusal would serve as a disincentive to third-party bidding.

In resisting the grant of leave to amend, the dissent points out that Jeremy's cannot "at the same time treat the contract as broken and as subsisting" (*Strasbourger v Leerburger*, 233 NY 55, 59 [1922]). That, however, is not what Jeremy's would be asserting were it to amend its complaint to seek alternative relief with respect to the $3.09 million offer. It has treated the Trust's refusal to perform under the agreement to sell the property for $2.7 million as a breach of that agreement; its pursuit of the subsequent $3.09 million offer has nothing to do with the earlier agreement. Whatever, if any, inconsistency there may be in Jeremy's actions, those actions cannot be characterized as treating the same contract as both broken and subsisting. In any event, a party is permitted to plead alternate theories (*Wilmoth v Sandor*, 259 AD2d 252, 254 [1999]) and leave to amend should be freely given (CPLR 3025 [b]). No legal prejudice in such an amendment is apparent.

We have examined Jeremy's other contentions and find that they are without merit.

Accordingly, the orders of the Supreme Court, New York County (Marcy S. Friedman, J.), entered April 16, 2004 and April 19, 2004, respectively, which granted defendants' motion to dismiss the complaint pursuant to CPLR 3211 (a) (5) and (7), denied plaintiffs' cross motion for leave to amend the complaint

to add a cause of action for promissory estoppel, and rescinded the parties' so-ordered stipulation and restored the summary holdover proceeding commenced by defendants to Civil Court, should be modified, on the law and the facts, and leave granted to plaintiffs to amend the complaint to plead, if they be so advised, a cause of action for breach of the implied covenant of good faith and fair dealing with respect to the $3.09 million offer and for specific performance with respect to that offer, and, except as thus modified, affirmed, without costs or disbursements.

GONZALEZ, J. (dissenting). The majority in this case has misinterpreted the key provision in the parties' lease granting the commercial tenant a "last right of refusal" to beat the terms and price of any bona fide third-party offer. In doing so, the majority has judicially rewritten the lease to grant the tenant a different and novel right—a right to accept only the "last offer"—thereby rendering the landlord's statute of frauds defense moot and inviting the tenant to sue on a subsequent written offer that it had never sought to enforce.

Because I believe the tenant's acceptance of the landlord's $2.7 million offer was unenforceable under the statute of frauds, which is the real issue in this case, and because the tenant charted its own litigation course by suing exclusively on that $2.7 million offer while declining to amend the complaint to seek enforcement of a later $3.09 million offer, no basis exists to grant the tenant leave to replead this new cause of action after an otherwise unsuccessful appeal. Accordingly, I respectfully dissent and would affirm both orders of the Supreme Court.

The issue on this appeal is whether plaintiff tenant is entitled to specific performance of the landlord's oral offer to sell certain property for $2.7 million pursuant to a right of first refusal in the parties' lease. A corollary issue is whether a written right of first refusal, standing alone, is sufficient to satisfy the statute of frauds. The allegations of plaintiffs' complaint, assumed to be true for the purposes of this appeal (*Cron v Hargro Fabrics*, 91 NY2d 362, 366 [1998]), are as follows: On or about February 28, 1988, plaintiff tenants, Jeremy's Ale House and its principal Jeremy Holin (Jeremy's), entered into a lease agreement with the predecessor to defendants, the Joselyn Luchnick Irrevocable Trust and its principal Alan Luchnick (the Trust), for real property located at 254-258 Front Street in Manhattan. The lease term was for 15 years and 3 months, with an expiration date of May 21, 2003.

On or about December 7, 1999, Jeremy's and the Trust agreed to a modification of the lease, the terms of which were set forth in a letter from the Trust to Jeremy's. The letter grants Jeremy's a "last right of refusal" as follows:

> "Starting January 1, 2000 the rent will be raised five hundred dollars a month. Effective May 1, 2000 the rent will be raised an additional five hundred dollars. *In consideration of these increases in the event of a sale to a third party (not an asset transfer in the family) you will have last right of refusal to beat the terms and price by 3% of any bona fide offer*" (emphasis added).

The subject lease expired according to its terms on May 21, 2003, whereupon Jeremy's became a month-to-month tenant paying a monthly rent of $7,500. The lease was not renewed.

In or about February 2003, approximately three months before the lease expired, the Trust contacted Jeremy's and offered to sell the subject property to it for $1 million, or the appraised value, whichever was higher. Jeremy's accepted the offer. Neither the Trust's offer nor Jeremy's acceptance was in writing.

Thereafter, the Trust advised Jeremy's that it would only sell the property for $1.2 million. Jeremy's again agreed to this price, subject to the condition that it could meet the offer economically. In July 2003, two months after the lease expired, Jeremy's principal, Holin, advised the Trust that he would meet the offer of $1.2 million by liquidating assets, except for his vacation home in Florida. This purported offer and acceptance were also not in writing.

Shortly thereafter, the Trust informed Holin that it had learned that the property's value was significantly higher than $1.2 million and that it intended to put the property on the open market to obtain the highest possible price. Around this same time, the Trust advised Holin to immediately liquidate his assets so that Jeremy's would be in a position to close quickly in the event a third-party offer was made and Jeremy's intended to beat it by 3%.

In September 2003, the Trust advised Jeremy's that it had received a bona fide offer of $2.5 million for the property and that it would sell the same to Jeremy's for $2.7 million pursuant to the right of first refusal. Although the $2.7 million purchase price was in excess of the 3% premium called for in

the right of first refusal, Jeremy's agreed to this price. Again, neither the offer nor the acceptance was in writing. As a result, Holin began immediately liquidating his assets and sold his Florida vacation home in anticipation of financing the purchase of the property.

Sometime thereafter, the Trust advised Jeremy's that it had received yet another offer for the property in the amount of $3.2 million. In addition, the Trust announced that the monthly rent on Jeremy's month-to-month tenancy would be increased to $13,000 for December 2003 and January 2004, and further demanded that Jeremy's vacate by January 31, 2004. The Trust also requested that Jeremy's consent to a judgment of possession and warrant of eviction and that it execute a waiver of its right to purchase the property. On or about December 3, 2003 the Trust posted a notice of nonpayment of rent in the amount of $13,000 on Jeremy's door and Jeremy's responded by tendering a check to the Trust for $7,500.

Finally, on or about December 15, 2003, the Trust advised Jeremy's by letter that it had received another offer for $3 million and that it would sell to Jeremy's for $3.09 million if Jeremy's would close by January 31, 2004.

Jeremy's commenced the instant action on December 16, 2003 by service of a summons and complaint and a notice of pendency.[1] The complaint alleged four causes of action: (1) specific performance of the agreement to sell to Jeremy's for $2.7 million pursuant to the right of first refusal; (2) a declaratory judgment that, inter alia, the right of first refusal and the Trust's agreement to sell the property to Jeremy's for $2.7 million are valid and enforceable agreements; (3) a preliminary injunction preventing the Trust from terminating its tenancy or seeking possession; and (4) damages resulting from the Trust's breach of the implied covenant of good faith and fair dealing.

Prior to serving an answer, the Trust moved to dismiss the complaint pursuant to CPLR 3211 (a) (5) (barred by the statute of frauds) and (7) (failure to state a cause of action). The Trust alleged that Jeremy's purported exercise of its right of first refusal was barred by the statute of frauds, and that the part performance exception to the statute of frauds was inapplicable because Jeremy's purported liquidation of assets was not

---

1. On the same day, counsel for Jeremy's wrote to the Trust, indicating that it would respond to the $3.09 million offer within 30 days and requesting proof that the Trust received the $3 million third-party offer.

"unequivocally referable" to the alleged $2.7 million oral contract. It further argued that a cause of action for injunctive relief did not exist and that the claim for breach of a contractual duty of good faith and fair dealing was deficient because there was no enforceable contract.

Jeremy's opposed the motion and cross-moved for leave to file an amended complaint adding a cause of action for promissory estoppel.[2] The Trust opposed the cross motion to amend, arguing that the claim of promissory estoppel could not overcome the statute of frauds bar because Jeremy's purported acts of reliance, i.e., the liquidating of its assets, were not unequivocally referable to the alleged oral agreement.

In December 2003, the Trust sent Jeremy's a notice of termination and instituted summary holdover proceedings in Civil Court. After Jeremy's moved for a stay of the Civil Court proceedings and consolidation with this Supreme Court action, the parties executed a stipulation agreeing to removal and consolidation in Supreme Court.

In the order appealed from, Supreme Court granted the Trust's motion to dismiss the complaint and denied Jeremy's cross motion to amend. The court noted that unlike an option, a right of first refusal does not include an operative offer; rather, it merely restricts the power of the owner to sell without first offering the property to the holder upon the occurrence of a contingency: the owner's decision to sell to a third party. The court concluded that since it is only upon the owner's first-refusal offer and the holder's acceptance of that offer that a contract is made, and that since such contract in this case was for the sale of real property, the contract was subject to the statute of frauds.

In addition, the court rejected Jeremy's arguments for part performance and promissory estoppel since both theories were premised on Jeremy's conduct in liquidating assets being "unequivocally referable" to an oral agreement to sell the property for $2.7 million—which, the court concluded, was not the case here. As to Jeremy's cause of action for breach of the implied covenant of good faith and fair dealing, the court held that the Trust's conduct did not destroy Jeremy's right to receive the benefits of the contract conferring the right of first

---

2. In their cross motion, plaintiffs also withdrew their claims against defendant Luchnick individually, and their claims for a declaratory judgment and preliminary injunction against all defendants.

refusal since Jeremy's offer did not ripen into an enforceable contract due to the failure to comply with the statute of frauds.[3]

On appeal, Jeremy's primary argument is that a written right of first refusal to purchase real property may be specifically enforced without an additional writing, so long as the property owner's first-refusal offer is accepted by the rightholder prior to its expiration or the abandonment of the underlying third-party transaction. Thus, Jeremy's asserts that since the Trust offered the property to it for $2.7 million, based on a $2.5 million third-party offer, and Jeremy's immediately accepted the same, a binding contract for the purchase of real property was made and no additional writing was required. I disagree.

"It is axiomatic that an oral agreement for the sale of real property is unenforceable under the Statute of Frauds (General Obligations Law, § 5-703, subd 2)" (*Jonestown Place Corp. v 153 W. 33rd St. Corp.*, 53 NY2d 847, 849 [1981]). In order to determine whether the written right of first refusal in this case satisfies this writing requirement, it is necessary to review the important distinctions between options and rights of first refusal.

" 'An option contract is an agreement to hold an offer open; it confers upon the optionee, for consideration paid, the right to purchase at a later date' " (*Kaplan v Lippman*, 75 NY2d 320, 324 [1990], quoting *Leonard v Ickovic*, 79 AD2d 603 [1980], *affd* 55 NY2d 727 [1981]). The most significant aspect of an option is that it grants to the holder the power to compel the owner of the property to sell whether the owner is willing to part with ownership or not (*Metropolitan Transp. Auth. v Bruken Realty Corp.*, 67 NY2d 156, 163 [1986]).

Because an option to purchase an interest in real estate is essentially a conditional contract for a future conveyance of land, and one that cannot be revoked by the grantor, "a contract that creates such an option is within the Statute of Frauds (*see,* 2 Corbin, Contracts §§ 417, 418 [1950])" (*Kaplan v Lippman*, 75 NY2d at 325). Once the holder of the option gives notice of his intent to exercise the option in accordance with the option agreement, the unilateral option agreement ripens into a fully enforceable bilateral contract (*id.*).

---

3. Based upon its dismissal of the complaint in this action, the motion court issued a second order, entered April 19, 2004, rescinding the parties' so-ordered stipulation and returning the summary holdover proceeding to Civil Court. Given my view that the complaint in this action was properly dismissed, the April 19, 2004 order should also be affirmed.

In contrast, a right of first refusal provides the holder with a more limited right.

> "A preemptive right, or right of first refusal, does not give its holder the power to compel an unwilling owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the party holding the preemptive right so that he may meet a third-party offer or buy the property at some other price set by a previously stipulated method" (*Metropolitan Transp. Auth. v Bruken Realty Corp.*, 67 NY2d at 163).

Thus, the pivotal characteristic of a right of first refusal is that it "contemplates a willing seller who desires to part with the property" (*LIN Broadcasting Corp. v Metromedia, Inc.*, 74 NY2d 54, 60 [1989]).

Moreover, unlike an option, a right of first refusal does not include an irrevocable offer that stays open for an agreed-upon period. In fact, a right of first refusal does not include *any* offer at the time it is given. "[T]he only offer involved is one to be made in the future, if and when the owner reaches agreement with a third-party purchaser" (*id.*). A right of first refusal, therefore, merely acts as "a restriction on the power of one party to sell without first making an offer of purchase to the other party upon the happening of a contingency: the owner's decision to sell to a third party" (*id.*).

It should be obvious from the above that the triggering event activating a right of first refusal is the owner's determination to sell to a third party. What is not so evident, however, is the standard for determining when this determination has been made. It is obvious that evidence of an owner's written notice to the rightholder of an acceptable third-party offer, accompanied by a copy of the proposed third-party contract and an invitation to the holder to exercise the right of first refusal, would suffice to demonstrate the owner's willingness to sell. In many instances, even the mere existence of a written third-party contract of sale will suffice to show the owner's intent to sell, without any specific written first-refusal offer from the owner.

At the other end of the spectrum is the scenario presented in this case, where there is no third-party contract, no written first-refusal offer made to the holder nor any other writing signed by the owner memorializing the proposed third-party transaction or first-refusal offer. Here, the only evidence of the Trust's intent to sell is the complaint's allegation of an oral of-

fer to sell for $2.7 million and Jeremy's oral acceptance of that offer. Accordingly, the pivotal question is whether an oral offer is sufficient to show the owner's intent to sell, or, does the rationale underlying the statute of frauds require that the owner's intent to sell be in writing, signed by the party to be charged. We conclude that a writing is required.

I acknowledge the well-established rule that a written option agreement, standing alone, is sufficient to satisfy the writing requirement of the statute of frauds (*Kaplan v Lippman*, 75 NY2d at 325). As noted above, in *Kaplan* the Court of Appeals stated that "[b]ecause an option to purchase an interest in real property is in effect a conditional contract for a future conveyance of land, a contract that creates such an option is within the Statute of Frauds (*see,* Corbin, Contracts §§ 417, 418 [1950])" (*id.*). The *Kaplan* court found that the writing requirement was satisfied because "the option agreement was contained in a written sublease agreement that was signed by the party to be charged, here, the sublessors (*see, Crocker v Page*, 210 App Div 735, 736)" (*Kaplan v Lippman*, 75 NY2d at 325). Jeremy's suggests that in light of *Kaplan*, a right of first refusal should stand on the same footing and be enforceable without any additional writing.

It is here where the distinctions between an option and a right of first refusal become significant. From the discussion above, it is clear that the holder of an option has an unconditional and irrevocable right to exercise the option to purchase at the holder's sole discretion. Once given, there is nothing the owner can do to defeat the right of the holder to exercise the option in accordance with its terms. Thus, since the written option agreement already binds the owner to sell under the terms of the option, there is no need for any additional writing. The owner's obligations have been memorialized in full and an additional writing would be superfluous. Accordingly, since the written option agreement, signed by the owner, spells out the owner's absolute obligation to sell at the election of the right-holder, it satisfies the statute of frauds.

The right of first refusal stands on distinctly different ground with respect to the owner's obligations. As noted, there is no offer inherent in a right of first refusal when it is given; there is only a contractual obligation to make an offer to the holder once the owner has decided to sell to a third party. Moreover, since the exercise of the right of first refusal is entirely dependent on *the owner's determination* to sell to a third party, it fol-

lows that the owner incurs no obligation or liability until that point. In essence, a right of first refusal is a dormant right until it is triggered (*see Kalimian v MTM Assoc.*, 280 AD2d 275, 275-276 [2001], *lv dismissed* 96 NY2d 822 [2001]), and since that triggering event must come from the owner in the form of a determination to sell to a third party, that determination—in the form of a third-party contract or a written first-refusal offer—must be in writing in order to be enforceable against the owner (*see e.g. Whiteside v Petersen*, 204 Misc 1079, 1080 [1953] [tenant not entitled to specific performance unless it can produce written lease including "first option to buy" and a written contract indicating owner's willingness to sell]).

I also note that the purpose of the statute of frauds would be defeated if a right of first refusal could be enforced absent an additional writing. "The purpose of Statutes of Frauds is to avoid fraud by preventing the enforcement of contracts that were never in fact made. Generally the statute is satisfied by some note or memorandum signed by the party to be charged that is adequate to establish an agreement when considered in light of the admitted facts and surrounding circumstances" (*Henry L. Fox Co. v Kaufman Org.*, 74 NY2d 136, 140 [1989]).

Notably, the risk of fraud in the case of a right of first refusal is as substantial as in the case of an ordinary contract to sell real property. While the presence in the written lease of the right of first refusal is certainly proof that such right exists, there is no similar written proof that the Trust had decided to sell to a third party or that it had made a first-refusal offer to Jeremy's. The possibility of fraud remains strong where a rightholder relies on an oral offer and acceptance to establish a valid exercise of its first-refusal right. In contrast, the risk of fraud is not present in the case of an option, since the owner's obligation to sell has already been memorialized in a writing signed by the party to be charged. In this case, Jeremy's relies on an oral offer and oral acceptance of a first-refusal offer to sell real property, which is precisely the evil the statute of frauds was designed to eliminate.

Jeremy's nevertheless maintains that the case law supports its argument that an oral offer and acceptance are sufficient to establish a breach of the right of first refusal, irrespective of any additional writing. The weakness of this position is demonstrated by a single distinguishing fact from each of the cases upon which Jeremy's relies: there is an additional writing demonstrating the owner's willingness to sell to a third party.

In *Cortese v Connors* (1 NY2d 265, 267-268 [1956]), for example, the Court of Appeals ordered specific performance of a right of first refusal in the parties' lease where the landlord contracted to sell the demised premises to a third party without first offering the premises to the tenant in accordance with that right. In *Cortese*, the owner's written contract to sell to the third party provided clear and indisputable evidence that the landlord not only intended to sell the property, but actually attempted to do so (*see also Sargent v Halsey*, 75 Misc 2d 624, 626-628 [1973], *affd* 42 AD2d 375 [1973] [specific performance ordered where owners entered into written contracts to sell to third parties without affording holder his right of first refusal]). No such writing exists in this case to demonstrate the Trust's intent to sell to a third party.

Similarly, in *Bullock v Cutting* (155 App Div 825, 826-827 [1913]), a lessor provided written notice to a lessee that it had received a bona fide offer of $3,000 for the property and offered the property to the lessee at the same price pursuant to a right of first refusal. The lessee sent written acceptance of the offer, but when the lessee attempted to close the deal, the lessor refused to sell, citing a higher offer he had received. After the trial court dispossessed the tenant, the Third Department reversed, holding that the lessee had unequivocally accepted the lessor's first-refusal offer and ordered specific performance as the remedy (*id.* at 827-828). Here, again, the lessor had given written notice of its intent to sell, thereby obviating any statute of frauds problem. The lack of such a writing in this case renders it factually distinguishable.

Tellingly, Jeremy's has failed to identify a single case involving specific performance of a right of first refusal where the owner's intention to sell the property subject to the right was not evidenced by a formal writing expressing either the terms of the third-party contract or the terms of the first-refusal offer.[4] Nor should the absence of authorities on this point be surprising, given the widely recognized requirements of the statute of frauds and its applicability to contracts for the sale of real property.

Jeremy's next argues that the absence of an additional writing may be excused in this case under the part performance

---

4. *Hackal v Adler* (234 AD2d 341, 342-343 [1996]) is not such a case, since it is unclear from the decision whether an option or right of first refusal is involved and, in any event, the decision suggests that a written agreement to sell had been reached with a third party.

exception to the statute of frauds. It maintains that its principal's conduct in liquidating assets for the purpose of financing the purchase for $2.7 million, based on the Trust's alleged oral promise to sell, constitutes part performance so as to remove the bar of the statute of frauds.

Part performance will render an oral agreement for the purchase of real property enforceable only where such performance is "unequivocally referable" to the alleged agreement of sale (*Jonestown Place Corp. v 153 W. 33rd St. Corp.*, 53 NY2d at 849, quoting *Burns v McCormick*, 233 NY 230, 232 [1922]). "It is not sufficient . . . that the oral agreement gives significance to plaintiff's actions. Rather, the actions alone must be 'unintelligible or at least extraordinary', explainable only with reference to the oral agreement (*Burns v McCormick*, 233 NY 230, 232; *Cooper v Schube*, 86 AD2d 62, *affd on opn below* 57 NY2d 1016)" (*Anostario v Vicinanzo*, 59 NY2d 662, 664 [1983]).

Jeremy's actions in liquidating assets, standing alone, are not "unequivocally referable" to the alleged oral agreement to sell the property for $2.7 million (*see Jonestown Place Corp.*, 53 NY2d at 849). While such oral agreement provides one explanation for Jeremy's actions, this conduct might also have been attributable to the Trust's earlier offer to sell for $1 million in February 2003, or its subsequent written offer to sell it for $3.09 million in December 2003. Significantly, there is not a single document in the record which tends to connect plaintiff's actions to the alleged agreement to sell for $2.7 million. In short, Jeremy's liquidation of assets is equivocal insofar as it cannot be connected to any specific offer to sell at a specific price (*see Anostario v Vicinanzo*, 59 NY2d at 664; *see also Jonestown Place Corp.*, 53 NY2d at 849 [inasmuch as mere purchase of adjoining parcel of land from third party is equivocal, it is not sufficient to remove bar of statute of frauds]; *RAJ Acquisition Corp. v Atamanuk*, 272 AD2d 164 [2000] [obtaining mortgage commitment did not constitute part performance]).

For similar reasons, Supreme Court properly denied Jeremy's cross motion for leave to amend to add a cause of action for promissory estoppel. Promissory estoppel, like part performance, is not available as an exception to the statute of frauds unless "the acts taken in detrimental reliance are 'unequivocally referable' to the . . . oral agreement" (*Richardson & Lucas, Inc. v New York Athletic Club*, 304 AD2d 462, 463 [2003]). As noted above, Jeremy's alleged acts taken in reliance on the Trust's oral offer to sell for $2.7 million are equivocal, and do

not meet this standard. Moreover, as Supreme Court correctly found, Jeremy's may not circumvent the part performance rule by asserting an "independent" promissory estoppel claim (*Jonestown Place Corp.*, 53 NY2d at 849).

Finally, Supreme Court correctly concluded that Jeremy's had failed to state a valid claim for breach of the implied covenant of good faith and fair dealing. This covenant, which underlies all written agreements, is defined as "an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (*Kirke La Shelle Co. v Armstrong Co.*, 263 NY 79, 87 [1933]; *see also American Broadcasting Cos., Inc. v Wolf*, 76 AD2d 162, 171 [1980], *affd* 52 NY2d 394 [1981]; *Sargent v Halsey*, 75 Misc 2d at 627).

Jeremy's argues that the Trust breached the implied covenant of good faith and fair dealing by agreeing to sell the property to Jeremy's for $2.7 million and then refusing to convey the property, while continually raising the price. Jeremy's contends that the implied covenant exists with respect to the right of first refusal itself, and that the motion court erred in dismissing this cause of action on the ground that the separate oral agreement to sell for $2.7 million was unenforceable due to the statute of frauds.

While the Trust's negotiation tactics are hardly commendable, they did not constitute a breach of the implied covenant of good faith and fair dealing. The Trust's repeated oral offers to sell the property, followed by Jeremy's oral acceptances and the Trust's reneging on each deal, did not, literally speaking, destroy or injure Jeremy's right of first refusal to purchase the property. As discussed above, that right simply was not triggered by the Trust's oral offers to sell. Although the Trust was contractually obligated to make an offer to Jeremy's once it decided to sell the property, oral offers to sell may not be equated with a determination to sell. As we have previously held, the mere fielding of third-party offers by an owner and the oral communication of the same to the holder of a right of first refusal is insufficient to trigger that right where there is no written agreement establishing the owner's willingness to sell to a third party (*see Kalimian v MTM Assoc.*, 280 AD2d at 275-276).

"[A]n oral agreement to convey an estate or interest in real property . . . is 'nugatory and unenforceable,' and '[a] party to the agreement may legally and rightfully refuse to recognize or

perform it' (*Woolley v Stewart*, 222 NY 347, 350-351; General Obligations Law § 5-703)" (*Messner Vetere Berger McNamee Schmetterer Euro RSCG v Aegis Group*, 93 NY2d 229, 235 [1999]). Since a valid exercise of the right of first refusal requires an additional writing signed by the party to be charged, which is absent here, the Trust had no legal obligation to perform the alleged oral agreement to sell the property for $2.7 million. Accordingly, the Trust's refusal to perform was not a breach of the covenant of good faith and fair dealing.

The cases cited by Jeremy's are inapposite and do not compel a different result. In *Quigley v Capolongo* (53 AD2d 714, 714-715 [1976], *affd* 43 NY2d 748 [1977]), a property owner gave the plaintiff a right of first refusal to purchase the property if the owner received a bona fide offer within five years. Within the five-year period, however, the owner contracted to sell the property to Ithaca College, without first giving the plaintiff an opportunity to buy it. Although the sale fell apart when the College learned of plaintiff's first-refusal right, the deal was resurrected in the form of a "lease" agreement, whereby the College's lease term would extend beyond the five-year duration of plaintiff's right and the College was given an exclusive window to purchase the land before the lease expired (*id.*).

The Third Department, reversing the trial court, held that the owner breached his obligation under the right of first refusal, first, by failing to communicate the initial third-party offer from the College, and then, subsequently, "by entering into a contract, denominated a lease[,] in the hope of circumventing plaintiffs' rights" (*id.* at 715). Finding the "lease" a subterfuge that, in any event, was sufficient to "formalize[ ]" the owner's desire to sell to the College, thereby activating plaintiffs' right of first refusal, the Court ordered specific performance as the appropriate remedy (*id.* at 716).

This case bears little resemblance to *Quigley*. Jeremy's right to receive an offer was never activated by a formal writing demonstrating the Trust's agreement to sell to a third party. Thus, even if the Trust's repeated conveyance of oral offers was disingenuous and motivated solely by the desire to create an enhanced market for the property, the Trust was not guilty of any misconduct tending to impair Jeremy's rights *after* its obligation to convey a third-party offer was activated. On the contrary, the instant record discloses no effort by the Trust to convey the property to a third party in contravention of Jeremy's rights.

Likewise, in *Cipriano v Glen Cove Lodge #1458, B.P.O.E.* (1 NY3d 53, 56 [2003]), the owner entered into a contract to sell the subject property to a third party in violation of the holder's right of first refusal. While the sale was pending, the holder made repeated requests for a copy of the third-party contract and further provided written notice of his intent to exercise his first-refusal rights. However, the owner ignored these communications and refused to allow the holder an opportunity to buy the property (*id.* at 60). Insofar as relevant to this case, the Court of Appeals held that the owner had breached its contractual obligation to submit the third-party offer to the rightholder (*id.* at 61).

There is no parallel between *Cipriano* and this case. In *Cipriano*, the triggering event activating the holder's right—the owner's determination to sell to a third party—was unequivocally demonstrated by the existence of the third-party contract of sale. Here, other than the oral statements alleged in Jeremy's complaint, there is not a shred of evidence that the Trust entered into a third-party contract to sell. In the absence of an allegation by Jeremy's that a writing exists evincing the Trust's agreement to sell to a third party, and that the Trust failed in its obligation to make a first-refusal offer or has otherwise attempted to defeat or injure that right, no viable claim for breach of the implied covenant of good faith and fair dealing exists.

The majority's analysis is based on an incorrect interpretation of the "last right of refusal" provision in this case. It asserts that Jeremy's was not entitled to seek enforcement of the $2.7 million offer because "it was not the last offer." However, the terms of the provision do not expressly or impliedly limit the rightholder to the right to seek enforcement of only the "last" chronological offer. Such a limitation would make little sense since it would permit an owner to make an enforceable first-refusal offer to the holder (first offer), then breach the terms of that offer by ignoring the holder's acceptance, followed by another first-refusal offer at a higher price (second offer). Under the majority's theory, the holder's suit for specific performance of the first offer would be dismissed because it was not the "last" offer. In fact, however, assuming the first offer was memorialized in a writing and the holder actually accepted it, specific performance would be appropriate.

A more reasonable construction of this provision is that the term "last" refers to the rightholder's "last" or subsequent opportunity to either defeat the third-party sale by beating the of-

fer, or to allow the third-party sale to proceed by declining to beat such offer. Since the "last right" of refusal is intended as a beneficial right belonging to the holder, not the owner, it should be read as describing the holder's power to act and not as a limitation on the holder's right to choose among multiple offers.

Irrespective of our disagreement over the proper interpretation of the "last right of refusal," there is no basis in the record for the majority's determination to grant Jeremy's leave to replead new causes of action arising out of the same agreement. It is noteworthy that Jeremy's has specifically denied any intention to seek enforcement of any offer other than the one for $2.7 million. In its reply brief, Jeremy's discusses the multiple offers by the Trust and states: "the only offer and acceptance that Jeremy's seeks to enforce is the first one [for $2.7 million] made to Jeremy's pursuant to the Right to Purchase Agreement." From this statement, it can only be concluded that Jeremy's has waived the right to enforce any other offer from the trust, including the $3.09 million written offer of December 15, 2003.

In addition, granting Jeremy's leave to replead would be essentially inconsistent with its commencement of the instant action to specifically enforce the prior $2.7 million offer. When a party breaches an executory contract, the adverse party must elect to either treat the contract as broken or reject the breach and continue to treat the contract as valid (*Inter-Power of N.Y., Inc. v Niagara Mohawk Power Corp.*, 259 AD2d 932, 934 [1999], *lv denied* 93 NY2d 812 [1999]). The adverse party cannot "at the same time treat the contract as broken and as subsisting. One course of action excludes the other" (*Strasbourger v Leerburger*, 233 NY 55, 59 [1922]). Here, Jeremy's elected to treat the Trust's refusal to sell for $2.7 million as a breach and sued thereon, while simultaneously seeking to act on the subsequent $3.09 million offer by requesting, in a December 16, 2003 letter, the terms of the third-party offer. I find these actions to be inconsistent, fully justifying the Trust's failure to respond.

Also weighing against the majority's position is the fact that Jeremy's never sought to amend its complaint to assert a claim regarding the December 15, 2003 offer, despite knowledge of facts supporting such a claim. While such amendment could have been allowed had the request been timely made (CPLR 3025 [c]), granting leave to amend after dismissal of the complaint and an unsuccessful appeal should not be permitted (Siegel, Practice Commentaries, McKinney's Cons Laws of NY,

Book 7B, CPLR C3002:8 [where plaintiff omits a count, ground or theory from its complaint, amendment will not be precluded if prompt steps are taken to remedy the omission]).

ELLERIN and CATTERSON, JJ., concur with SULLIVAN, J.P.; WILLIAMS and GONZALEZ, JJ., dissent in a separate opinion by GONZALEZ, J.

Orders, Supreme Court, New York County, entered April 16, 2004 and April 19, 2004, modified, on the law and the facts, and leave granted to plaintiffs to amend the complaint to plead a cause of action for breach of the implied covenant of good faith and fair dealing and for specific performance, and, except as thus modified, affirmed, without costs or disbursements.